UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JOHNNY WAYNE DAVIS,

                Petitioner,

v.

MATT MACAULEY,

                Respondent.

_____/

Case No. 1:19-cv-700

Honorable Paul L. Maloney

## OPINION

     This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Johnny Wayne Davis is incarcerated with the Michigan Department of Corrections at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan. On February 5, 2016, following a six-day jury trial in the Wayne County Circuit Court, Petitioner was convicted of first-degree home invasion, in violation of Mich. Comp. Laws § 750.110a(2), torture, in violation of Mich. Comp. Laws § 750.85, and second-degree murder, in violation of Mich. Comp. Laws § 750.317. On February 18, 2016, the court sentenced Petitioner as a third habitual offender to a sentence of 20 to 40 years for home invasion, to be served consecutively to concurrent sentences of 20 to 40 years for torture and 27 to 40 years for murder.

     On August 29, 2019, Petitioner filed his initial habeas corpus petition, raising ten grounds for relief. (ECF No. 1.) Petitioner indicated that he had exhausted his first three habeas grounds in the state courts, but that he had not raised habeas grounds IV–X in the state courts. In an opinion and order (ECF Nos. 6 and 7) entered on October 25, 2019, the Court dismissed without prejudice Petitioner's unexhausted grounds for relief, stayed his exhausted grounds, and administratively

closed this matter until Petitioner filed a timely motion to amend his habeas petition to include any subsequently exhausted claims.

On February 1, 2023, Petitioner returned to this Court with a motion to lift the stay and amend his petition for habeas corpus. (ECF No. 8.) In an order (ECF No. 13) entered on February 14, 2023, the Court granted Petitioner's motion and directed the filing of his amended petition (ECF No. 14) and brief in support thereof (ECF No. 15). In his amended petition, Petitioner asserts the following seven grounds for relief:

I.     The trial court's questioning of Davis, during which the trial judge took on the role of the prosecutor, pierced the veil of judicial impartiality and denied Mr. Davis' due process right to a fair trial before an impartial judge. In the alternative, Mr. Davis was denied his Sixth Amendment right to the effective [assistance] of both trial and appellate counsel when his trial counsel failed to object to the trial court's questioning of Mr. Davis and appellate counsel failed to raise this issue on direct appeal.

II.    Insufficient evidence was presented during the Petitioner's trial to support the jury's verdicts of guilty beyond [a] reasonable doubt of one count each of second degree murder, torture and first degree home invasion . . . and constitutes a denial of the due process of law guaranteed by the Fifth and Fourteenth amendments of the United States Constitution.

III.   A petitioner's sentence of twenty-eight years to forty years in prison and the consecutive sentence of from twenty years to forty years in prison, constitute abusive sentences and a violation of the guarantee against cruel and unusual punishment provided by the United States Constitution.

IV.    Mr. Davis was denied his Sixth Amendment right to the effective assistance of counsel when his trial counsel failed to consult and secure funds for an ex[p]ert witness in forensic pathology, failed to object to Officer Dabliz's identification testimony, and failed to request the lesser included offense [instruction] of accessory after the fact.

V.     Due process of law under US Const Am XIV and Const 1963, Art. 1, § 20 requires a new trial based on the newly discovered evidence of his co-petitioner, Chiram Armstead's affidavit which he acknowledges Mr. Davis had no role in the death of Ms. Blevins.

VI.    Davis's convictions must be vacated under the actual innocence standard.

VII.   The trial court erred denying Davis's 6.500 motion.

(Am. Pet., ECF No. 14, PageID.128–130.) Respondent asserts that Petitioner's grounds for relief

lack merit.[1] (ECF No. 17.) For the following reasons, the Court concludes that Petitioner has failed

to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for

writ of habeas corpus.

**Discussion**

## I.    Factual Allegations

The Michigan Court of Appeals described the events underlying Petitioner's convictions

as follows:

> [Petitioner's] convictions arise from a brutal attack on the victim, Eleanor Blevins, after a group of three men broke into her motel room. On the evening of July 4, 2015, [Petitioner], Chiram Armstead, and Kyle Kelly arrived at the Victory Inn in Detroit and began pounding on the windows and doors of a motel room there. As the three men were attempting to break into her motel room, the victim called 911 requesting assistance. Eventually, Armstead was able to push open a window. Armstead entered the room, opened the door, and the other two followed him in, while the victim remained on the phone with 911.
>
> A recording of the 911 call was played for the jury and indicated that, shortly after gaining entrance, someone asked the victim for money. When the victim responded that she did not have any money, the person told her that she "got to die then." At that point, Armstead began to beat severely the victim and strangle her, eventually causing her death. Much of what happened was recorded on the motel's video surveillance system. Videos from this system were played for the jury and indicated that not only did [Petitioner] remain in the room during the attack, he also

---

[1] Respondent also contends that grounds I and III are procedurally defaulted. (ECF No. 17, PageID.235–236.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix,* 520 U.S. at 525*; Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

3

positioned himself in the doorway so as to block the victim's exit. At some point in the attack, the victim's wig fell off of her head. Surveillance video shows that [Petitioner] picked up the wig and wiped the door handle with it. The video shows [Petitioner] and the other two perpetrators leaving with bags from the victim's motel room.

[Petitioner] admitted that he was present for the attack, but testified that he believed the room was rented to Armstead and the items taken from there belonged to Armstead. [Petitioner] also argued that he tried, albeit unsuccessfully, to break up the fight. [Petitioner] admitted that he used the wig to wipe away trace evidence, but averred that he did so because he did not want to be liable for damage to the room.

*People v. Davis*, No. 332009, 2017 WL 4078054, at *1 (Mich. Ct. App. Sept. 14, 2017).

Jury selection for Petitioner's trial occurred on January 26, 2016. (Trial Tr. I, ECF No. 18-9.) Over the course of four days, the jury heard testimony from numerous witnesses, including the victim's sister, a medical examiner, employees of the Victory Inn, law enforcement officers, forensic technicians, and Petitioner himself. (Trial Tr. II, IV, and V, ECF Nos. 18-10, 18-12, and 18-13.) On February 5, 2016, the jury returned a guilty verdict. (Trial Tr. VI, ECF No. 18-14, PageID.1151–1152.) Petitioner appeared before the trial court for sentencing on February 18, 2016. (ECF No. 18-15.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals. Petitioner raised the following issues in his counseled brief: (1) the trial court erred by admitting inflammatory photographs over trial counsel's objection; (2) there was insufficient evidence to support the guilty verdicts; and (3) the trial court abused its discretion by imposing consecutive sentences. (ECF No. 18-19, PageID.2094.) Petitioner also filed a *pro per* supplemental brief, reiterating his claims regarding insufficiency of the evidence as well as a claim that the trial court erred in instructing the jury on second-degree murder. (*Id.*, PageID.2148.) In an opinion entered on September 14, 2017, the court of appeals affirmed Petitioner's convictions and sentences. *Davis*, 2017 WL 4078054, at *1. The Michigan Supreme Court denied Petitioner's

application for leave to appeal on May 29, 2019. *See People v. Davis*, 911 N.W.2d 696 (Mich. 2018).

As noted *supra*, Petitioner filed his initial § 2254 petition in this Court on August 29, 2019. (ECF No. 1.) In an opinion and order (ECF Nos. 6 and 7) entered on October 25, 2019, the Court dismissed without prejudice Petitioner's unexhausted grounds for relief, stayed his exhausted grounds, and administratively closed this matter until Petitioner filed a timely motion to amend his habeas petition to include any subsequently exhausted claims.

Petitioner subsequently filed a motion for relief from judgment, pursuant to Michigan Court Rule 6.500, in the Wayne County Circuit Court. (ECF No. 18-16.) Petitioner asserted the following grounds for relief in his Rule 6.500 motion: (1) ineffective assistance of trial and appellate counsel; (2) the prosecution failed to comply with the sentence enhancement procedure set forth in Mich. Comp. Laws § 769.13; (3) various Offense Variables (OVs) were improperly scored; (4) Petitioner was entitled to a new trial pursuant to newly discovered evidence and claims of actual innocence; and (5) the trial judge was biased against Petitioner. (*Id.*, PageID.1202.) The trial court denied Petitioner's Rule 6.500 motion in an opinion and order entered on February 21, 2020. (ECF No. 18-17.) The court of appeals subsequently affirmed the denial of Petitioner's Rule 6.500 motion. *See People v. Davis*, No. 353689, at *1 (Mich. Ct. App. Apr. 21, 2022). The Michigan Supreme Court denied Petitioner's application for leave to appeal on January 4, 2023. *See People v. Davis*, 982 N.W.2d 686 (Mich. 2023). Petitioner's amended § 2254 petition followed.

## II.    Request for an Evidentiary Hearing

In his brief supporting his amended habeas petition, Petitioner requests that the Court hold an evidentiary hearing. (Br. Supp. Am. Pet., ECF No. 15, PageID.179.) Generally, habeas corpus actions are determined on the basis of the record made in the state court. *See* Rule 8, Rules

Governing § 2254 Cases. The presentation of new evidence at an evidentiary hearing in the district

court is not mandatory unless one of the circumstances listed in 28 U.S.C. § 2254(e)(2) is present.

*See Sanders v. Freeman*, 221 F.3d 846, 852 (6th Cir. 2000). The Sixth Circuit Court of Appeals

recently reviewed the requirements of the statute:

> As the Supreme Court recently recognized, [the Antiterrorism and Effective Death
> Penalty Act] "restricts the ability of a federal habeas court to develop and consider
> new evidence." *Shoop* [*v. Twyford*], 142 S. Ct. [2037,] 2043 [(2022)]. Specifically,
> the statute allows the development of new evidence in "two quite limited
> situations": (1) when the claim relies on a "new" and "previously unavailable" "rule
> of constitutional law" made retroactive by the Supreme Court, or (2) when the claim
> relies on a "factual predicate that could not have been previously discovered
> through the exercise of due diligence." *Id.* at 2044 (quoting 28 U.S.C. § 2254(e)(2)).
> And even if a prisoner can satisfy either of those exceptions, to obtain an
> evidentiary hearing, he still must show by "clear and convincing evidence" that "no
> reasonable factfinder" would have convicted him of the crime charged. *Shinn* [*v.
> Ramirez*], 142 S. Ct. [1718,] 1734 [(2022)] (quoting 28 U.S.C. § 2245(e)(2)(A)(i),
> (ii)). Mammone does not purport to satisfy any of these stringent requirements for
> obtaining discovery or an evidentiary hearing: he does not rely on a new rule of
> constitutional law, he does not contend that the factual predicate for his
> constitutional claims could not have been previously discovered, and he points to
> no clear and convincing evidence that would cast doubt on the jury's verdict.

*Mammone v. Jenkins*, 49 F.4th 1026, 1058–59 (6th Cir. 2022).

Petitioner, like Mammone, does not rely upon any new rule of constitutional law, nor does

his claim rely on a factual predicate that could not have been previously discovered through the

exercise of due diligence.[2] Moreover, even if Petitioner cleared those hurdles, he does not show

by any evidence, much less clear and convincing evidence, that no reasonable factfinder would

---

[2] Petitioner contends that the affidavit offered by his co-defendant is "newly discovered evidence,"
(Am. Pet., ECF No. 14, PageID.129), but as set forth fully below, Petitioner has failed to
demonstrate that the factual predicate of his claim could not have been previously discovered
through the exercise of due diligence. *See infra* Part IV.E.

have convicted him. Under these circumstances, there is no basis to hold an evidentiary hearing. Accordingly, Petitioner's request for a hearing will be denied.[3]

### III.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This

---

[3] To the extent that Petitioner contends that the trial court erred by not holding an evidentiary hearing regarding Petitioner's claims of ineffective assistance, such a claim is not cognizable on federal habeas review. *See Simpson v. Jones*, 238 F.3d 399, 406–07 (6th Cir. 2000) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Smith v. Phillips*, 455 U.S. 209, 221 (1982)). In addition, "the Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Kirby v. Dutton*, 794 F.2d 245, 246–47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002)). "[T]he traditional function of the writ is to secure release from illegal custody," *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973), but a due process claim with respect to post-conviction proceedings, even if resolved in Petitioner's favor, would not impact Petitioner's custody. In reviewing such a claim, the Court "would not be reviewing any matter directly pertaining to" that custody. *Cress*, 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 247). If this Court were to conclude that the trial court erred in denying Petitioner an evidentiary hearing, Petitioner would not automatically be released from custody or be granted a new trial.

standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.   Discussion

### A.   Ground I—Judicial Bias

As his first ground for relief, Petitioner contends that his due process rights were violated when the trial judge "took on the role of the prosecutor, pierc[ing] the veil of judicial impartiality." (Am. Pet., ECF No. 14, PageID.128.) Specifically, Petitioner alleges that the trial judge questioned him in violation of his due process rights. (*Id.*) Petitioner also avers that trial counsel was ineffective for failing to object to the court's questioning and that appellate counsel was ineffective for failing to raise the issue on direct appeal. (*Id.*) The Court will address the due process aspect here; the ineffective assistance aspect is addressed *infra* in Part IV.D.2.

After the prosecutor cross-examined, Petitioner, the following exchange occurred between the trial judge and Petitioner:

> THE COURT: Mr. Davis, these additional questions have been asked of you by members of the jury. So you need to look at them, and I'll ask you the question.
>
> How often had you been to the Victory Inn before July 4, 2015?
>
> THE WITNESS: Last time I been to the Victory Inn, maybe I want to say July 2014.
>
> THE COURT: This incident happened at about 10 o'clock at night?
>
> THE WITNESS: Yes.
>
> THE COURT: And was there all sorts of traffic going by the Victory Inn at that time?
>
> THE WITNESS: Yes.
>
> THE COURT: But these rooms were off a courtyard, weren't they?
>
> THE WITNESS: Excuse me?
>
> THE COURT: These rooms were off a courtyard, specifically Room Number 133-
>
> THE WITNESS: Yes.
>
> THE COURT: --isn't that right?

THE WITNESS: Yes.

THE COURT: There was no—there was no cars speeding up and down the courtyard outside of Room 133, were there?

THE WITNESS: No.

THE COURT: So did you hear the woman screaming inside as she was on—making the 9-1-1- call?

DEFENDANT DAVIS: No, I didn't.

THE COURT: What was there to prevent you from hearing it?

DEFENDANT DAVIS: I don't know. Honestly, I never heard her make a 9-1-1-call. I never heard him demand anything for money.

THE COURT: That's not what I asked you. What was preventing you from hearing her screaming on the telephone, pleading for help?

DEFENDANT DAVIS: I don't think I was in the room at that point to be honest.

THE COURT: I'm not asking whether you were in the room. I'm asking you what prevented you from hearing her screams?

THE WITNESS: I heard her scream once they fought. I don't know, honestly, like to answer that question accurately. I don't really know. I heard once they start fighting.

THE COURT: Why did you ever go to the Victory Inn to begin with?

THE WITNESS: Because Armstead told me he had a room up there. I wouldn't have went up there for no reason.

THE COURT: So if you know that someone that you have a friendship with is in a—or supposedly has a motel room assigned to them—

THE WITNESS: Yes.

THE COURT: --and they cannot gain entrance to it, does that mean that you have every right to break down the door or break in the window to get inside that motel room?

THE WITNESS: It's his room. I'm not saying that it's right.

THE COURT: No, I'm asking you.

THE WITNESS: No, I'm not say—

THE COURT: Do you have any right to go into that room? Do you have any right to break down a door or break a window to go into a motel room?

THE WITNESS: That he occupied, to answer the question honestly, I thought it was just his room, so—

THE COURT: What gaves (sic) you—what gives you the right to break down the door of a motel room or break out a window to gain entrance into a motel room? What gives you that right?

THE WITNESS: I thought it was his room.

THE COURT: Anything preventing you from going to the office, the clerk, to get the clerk to come down and open up the door if the door or if that room was legitimately that of Mr. Armstead?

THE WITNESS: I wasn't thinking that way that night.

THE COURT: Well, what were you thinking?

THE WITNESS: I was just thinking that this was his room.

THE COURT: Well, that doesn't make any sense to me. You were thinking it was his room. Okay, so now he can't gain entrance to it. So you've been in a motel room before, haven't you?

THE WITNESS: Yes.

THE COURT: Okay, and if your key doesn't work, you can go to the clerk and have the clerk come down and open up the door for you; isn't that right?

THE WITNESS: Yes, that's right.

THE COURT: So why didn't you do that that night?

THE WITNESS: Because I was just trying to help him get in his room.

THE COURT: You were just trying to help him, oh. And by trying to help him, what does that mean, by breaking down the door, breaking open the window?

THE WITNESS: By—I thought the window was going to slide open, and then I thought he could just maybe get in and just stay in his room.

THE COURT: When you knew someone else was in the room?

THE WITNESS: I never knew anyone was in the room.

THE COURT: You could hear someone screaming for help, couldn't you?

THE WITNESS: Once the fight started, yes.

THE COURT: Fight, what fight?

THE WITNESS: I'm talking about what I heard, sir. I heard the fight, and that's what I—

THE COURT: The jury would like to have the 911 call replayed. Do it.

MS. TUSAR: Yes.

(9-1-1 call replayed)

THE COURT: You couldn't hear that?

THE WITNESS: No.

THE COURT: You can't hear that now?

THE WITNESS: Yes, I can hear it now.

THE COURT: You can hear it now pretty good?

THE WITNESS: Yes.

THE COURT: But you couldn't hear it then?

THE WITNESS: No, not until we got in the room. I couldn't hear what was said outside.

THE COURT: So when you got into the room and you heard that, why didn't you leave right away?

THE WITNESS: Because I—

THE COURT: You were in the wrong place at the wrong time, weren't you?

THE WITNESS: Yes.

THE COURT: Yeah. You said that you were supposed to go on West Parkway and watch fireworks after the video shoot. What and why did you change your plans and get dropped off at the Victory Inn instead?

THE WITNESS: I actually did watch the fireworks. That's how I met up with Pie Pie, the guy that dropped us off.

THE COURT: Why did you care that much about getting inside that room?

THE WITNESS: I was trying to help him get inside the room.

13

THE COURT: Why?

THE WITNESS: Because I just thought it was his room that he occupied. I was trying to help him get inside.

THE COURT: Why didn't you go to the front desk to help you open the room?

THE WITNESS: I wasn't—like I said, smoking and drinking, I'm not trying to blame it on that, but it's no excuse, but I was just trying to help him get in his room that I thought was truly his. I'm not saying it was the right way to get in there, but—

(Trial Tr. IV, ECF No. 18-12, PageID.1071–1077.) After the prosecutor re-crossed Petitioner, the trial judge engaged in the following exchange with Petitioner:

THE COURT: Mr. Davis, these additional questions have been asked of you by members of the jury.

Do you know the difference between right and wrong?

THE WITNESS: Yes.

THE COURT: And what is that difference?

THE WITNESS: Right is wrong, there's certain ways you can go about things is really an option to me. Certain things that you can go about doing things.

THE COURT: Is committing a crime the right thing to do?

THE WITNESS: No.

THE COURT: Is it the wrong thing to do?

THE WITNESS: Yes.

THE COURT: At anytime during the course of this incident happening in Room 133, did you ever think that this was right?

THE WITNESS: Not during the incident, the fight, I never thought it was right for them to be fighting.

THE COURT: Did you ever notice the condition of the victim as you left Room 133?

THE WITNESS: I really didn't because the lamp was kind of—the room was kind of dark. That's how it was. I never really seen the condition. I just seen them fighting.

(*Id.*, PageID.1079–1080.)

14

On appeal from the denial of Petitioner's Rule 6.500 motion, the court of appeals agreed "that some of the trial judge's questions and conduct were improper," but did not agree with Petitioner that "the challenged conduct entitle[d] [him] to relief from judgment." *Davis*, 2022 WL 1195287, at *5. Specifically, the court stated:

> [Petitioner] takes exception to the trial judge's questioning of him, claiming that it pierced the veil of judicial impartiality. First, the general nature of this judicial intervention—questioning of a witness by the trial court—is not inappropriate. MRE 614(b); *Stevens*, 498 Mich. at 173. Such questioning can "produce fuller and more exact testimony or elicit additional relevant information." *Stevens*, 498 Mich. at 173. But "the central object of judicial questioning should be to clarify," and it is inappropriate for a judge to exhibit disbelief of a witness, whether intentional or unintentional. *Id.* at 173–174. Second, the trial judge's tone and demeanor should be evaluated. *Id.* at 174. "A judge must proceed with particular care when engaging with a criminal defendant." *Id.* at 175. Third, an appellate court should "consider the scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein." *Id.* at 176. In a longer or more complex trial, judicial intervention may be more appropriate than in a shorter or less complex one. *Id.* And given that a trial judge's objective should be to clarify, "a judge's inquiries may be more appropriate when a witness testifies about a topic that is convoluted, technical, scientific, or otherwise difficult for a jury to understand." *Id.* "Fourth, and in conjunction with the third factor, a reviewing court should consider the extent to which a judge's comments or questions were directed at one side more than the other." *Id.* at 176–177. The presence or absence of a curative instruction is also a factor to take into account. *Id.* at 177.
>
> We agree that some of the trial court's questions and conduct were inappropriate. The judge did ask some questions that were material to issues in the case, were limited in scope, and appeared to seek to provide a fuller explanation to the jury about [Petitioner's] testimony. And even if the elicited testimony could be deemed damaging to [Petitioner's] case, that fact alone does not demonstrate that the trial court's questioning was improper. *People v Davis*, 216 Mich. App. 47, 52; 549 N.W.2d 1 (1996). However, there were also questions that were not asked in a neutral manner, such as when the judge appeared to persistently challenge [Petitioner] about his testimony that he did not hear the victim screaming, and when the judge questioned the reasonableness of [Petitioner's] actions in response to his belief that codefendant Armstead could not get into what [Petitioner] thought was Armstead's room. We cannot determine the judge's demeanor and tone because there was no objection and thus no record was made. And as the trial court pointed out, this was one line of questioning in a complex and lengthy trial. But many questions, on their face, appear to exhibit the judge's disbelief of [Petitioner], which is inappropriate. *Stevens*, 498 Mich. at 173–174. Indeed, in response to one of [Petitioner's] answers about thinking that the room was codefendant Armstead's

room, the judge stated: "Well, that doesn't make any sense to me." Thus, [Petitioner] has shown that some of the trial judge's conduct was improper.

However, [Petitioner] has not demonstrated that he is entitled to relief from judgment. Whether a judge's conduct pierced the veil of judicial impartiality is evaluated by considering the totality of the circumstances to determine whether it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. *Id.* at 171. As noted, the judge's questions were material to issues in the case, and many were limited in scope and appeared to seek to provide a fuller explanation of [Petitioner's] responses. Indeed, some of [Petitioner's] answers were not responsive to the questions asked, and the trial court attempted to clarify what was being asked. To the extent that some of the judge's questions exhibited a disbelief in some of [Petitioner's] responses, the judge also instructed the jury that the case must be decided on the evidence only, that his comments, rulings, and questions are not evidence, that he is not trying to influence the vote or express a personal opinion about the case when he makes a comment or a ruling, and that if the jury believes that the court has an opinion, that opinion must be disregarded. Because it is well established that jurors are presumed to follow their instructions, "the presence of a curative instruction does tend to cut against a finding of judicial bias." *Id.* at 190.

Furthermore, to show that [Petitioner] is entitled to postconviction relief, he must show actual prejudice, meaning "in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." MCR 6.508(D)(3)(b)(*i*)(A). We agree with the trial court that [Petitioner] cannot establish a "reasonably likely chance of acquittal" under MCR 6.508(D), i.e., actual prejudice, because "there was ample evidence before the jury to establish the [Petitioner's] culpability." In its prior opinion, this Court discussed the evidence as follows:

> As the three men were attempting to break into her motel room, the victim called 911 requesting assistance. Eventually, Armstead was able to push open a window. Armstead entered the room, opened the door, and the other two followed him in, while the victim remained on the phone with 911.
>
> A recording of the 911 call was played for the jury and indicated that, shortly after gaining entrance, someone asked the victim for money. When the victim responded that she did not have any money, the person told her that she "got to die then." At that point, Armstead began to beat severely the victim and strangle her, eventually causing her death. Much of what happened was recorded on the motel's video surveillance system. Videos from this system were played for the jury and indicated that not only did [Petitioner] remain in the room during the attack, he also positioned himself in the doorway so as to block the victim's exit. At some point in the attack, the victim's wig fell off of her head. Surveillance video shows that [Petitioner] picked up the wig and wiped the door handle with it. The video

shows [Petitioner] and the other two perpetrators leaving with bags from the victim's motel room. [*Davis*, unpub. op. at 1–2.]

With respect to [Petitioner's] culpability, this Court observed:

> [Petitioner] helped Armstead break into the room and, if he was not the one speaking to Blevins himself, he was present when a codefendant threatened to kill Blevins. [Petitioner] remained in the room while Armstead assaulted the victim, and [Petitioner] crowded the doorway to block the victim's main avenue of escape. [Petitioner] wiped trace evidence off the door with the victim's wig, and he carried bags of the victim's belongings from the room. [*Id.* at 5.]

Given the evidence presented at trial, [Petitioner] cannot meet the "actual prejudice" requirement set forth in MCR 6.508(D)(3). Consequently, he is not entitled to any relief from judgment on this basis.

*Davis*, 2022 WL 1195287, at *5–7.

Petitioner now argues that the court of appeals' "holding is problematic because judicial bias creates a structural defect in a trial, making harmless error (prejudice) analysis inappropriate." (Br. Supp. Am. Pet., ECF No. 15, PageID.145.) According to Petitioner, "the trial court crossed the line between clarification of testimony and impermissible questioning that showed judicial partiality. The trial judge questioned [Petitioner] in such a way that clearly suggested that the trial court believed [Petitioner] was not credible or believable, thus influencing the jury to believe the same." (*Id.*, PageID.150–151.) Petitioner avers that because the court of appeals treated his "constitutional claim of judicial bias as susceptible to an analysis evaluating any error for prejudice, its opinion is 'contrary to' clearly established federal law." (*Id.*, PageID.152.)

Petitioner is correct that ***actual*** judicial bias amounts to structural error that is not susceptible to harmless error analysis. *See Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927) (holding that a judge with a direct, personal, substantial pecuniary interest in reach a conclusion against [the criminal defendant] in his case" was constitutionally disqualified)); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (same); *Bracy*

17

*v. Gramley*, 520 U.S. 899, 904–905 (1997) (stating that "the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no ***actual*** bias against the defendant or interest in the outcome of his particular case." (citations omitted, emphasis added)). But many circumstances that lead a criminal defendant to question a judge's impartiality do not involve "actual bias:"

> [M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S.Ct. 1580, 1588–1589, 89 L.Ed.2d 823 (1986). Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar. *See, e.g., Aetna, id.*, at 820–821, 106 S.Ct., at 1584–1585; *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927); 28 U.S.C. §§ 144, 455; ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980)

*Bracy*, 520 U.S. at 904.

A judge's conduct at trial may be "characterized as 'bias' or 'prejudice'" only if "it is so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551 (1994). However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge's] position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016) (internal quotation marks omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009) ("The difficulties of inquiring into actual bias . . . simply underscore the need for objective rules.").

The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases: (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. at 523; (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Offut v. United States*, 348 U.S. 11, 17 (1954); *see also Taylor v. Hayes*, 418 U.S.

488 (1974); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 579 U.S. at 8. Beyond that, the courts indulge "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). As the Sixth Circuit has noted:

> The presumption of impartiality stems not merely from the judicial-bias caselaw, *see* [*Withrow*], but from the more generally applicable presumption that judges know the law and apply it in making their decisions, *see Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997), and the even more generally applicable presumption of regularity, *see Parke v. Raley*, 506 U.S. 20, 30–31 (1992); *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).

*Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013).

Petitioner's bias claim does not implicate the indicia of bias set forth in *Tumey*, *Offut*, and *Williams*. Nothing in the record suggests that the trial judge had a pecuniary interest in Petitioner's case, that the trial judge became embroiled with Petitioner, and that the judge had prior involvement in the matter as a prosecutor. Rather, Petitioner categorizes his bias claim as akin to one where "the trial judge is accused of conducting the proceedings in a manner that strongly suggests to the jury that the judge disbelieves the defendant's case, or for other reasons, thinks the prosecution should prevail." (Br. Supp. Am. Pet., ECF No. 15, PageID.147.) He avers that the type of bias displayed by the trial judge is akin to the type of bias the Supreme Court defined in *Liteky*. (*Id.*)

The petitioners in *Liteky* had been charged with willful destruction of United States property. *Id.* at 542. Prior to trial, they moved to disqualify the judge based upon "events that had occurred during and immediately after an earlier trial, involving petitioner Bourgeois, before the same District Judge." *Id.* Specifically, the petitioners argued that, during that earlier case,

> the judge had displayed "impatience, disregard for the defense and animosity" toward Bourgeois, Bourgeois' codefendants, and their beliefs. The alleged evidence of that included the following words and acts by the judge: stating at the outset of the trial that its purpose was to try a criminal case and not to provide a political

forum; observing after Bourgeois' opening statement (which described the purpose of his protest) that the statement ought to have been directed toward the anticipated evidentiary showing; limiting defense counsel's cross-examination; questioning witnesses; periodically cautioning defense counsel to confine his questions to issues material to trial; similarly admonishing witnesses to keep answers responsive to actual questions directed to material issues; admonishing Bourgeois that closing argument was not a time for "making a speech" in a "political forum"; and giving Bourgeois what petitioners considered to be an excessive sentence. The final asserted ground for disqualification—and the one that counsel for petitioners described at oral argument as the most serious—was the judge's interruption of the closing argument of one of Bourgeois' codefendants, instructing him to cease the introduction of new facts, and to restrict himself to discussion of evidence already presented.

*Id.* at 542–43.

The Supreme Court rejected the petitioners' arguments that the judge should have recused himself. In its analysis, the Court noted that "[t]he judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person." *Id.* at 550–51. The Court cautioned, however, that "the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." *Id.* at 551. The Court then set forth the showing petitioners needed to make to succeed on a judicial bias claim:

First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S. [563, 583 (1966)]. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of

20

> favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555–556 (emphasis in original).[4] Overall, the Court concluded, the comments made by the judge during the prior proceeding did not "display[] deep-seated and unequivocal antagonism that would render fair judgment impossible." *Id.* at 556.

Notably, in *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008), the Sixth Circuit conducted an exhaustive analysis of Supreme Court precedent governing judicial bias. *See id.* at 393–407. The Sixth Circuit provided the following summary following its analysis:

> In sum, one *could* read the Supreme Court precedent in this area as holding that the probability of bias—based on a likelihood or appearance of bias—can be sufficient to disqualify a judge and violate a party's constitutional right to due process. But, one *could also* read these cases as holding that, other than in cases of contempt arising in a closed (secret) hearing, only actual bias or pecuniary-interest-based probability is sufficient—and, moreover, that a matter of mere kinship has, as of yet, never been acknowledged as a sufficiently biasing interest. Regardless of the preferred reading—or the merits of one reading over the other—the fact that there are two or more reasonable readings compels the conclusion that this precedent is not "clearly established."

*Id.* at 407.

---

[4] *Liteky* is a case that addresses the statutory recusal standard for federal judges. The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause. *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

The Sixth Circuit has further noted that judicial bias may be established when "the judge's remarks clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the [c]ourt with one of the parties." *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) (internal quotation marks and citations omitted). Moreover, a judge may commit misconduct when he "abandons his proper rule and assumes [the role] of [an] advocate" when questioning a witness. *Id.* (alteration in original). The Sixth Circuit has set forth the following considerations when analyzing a claim of judicial misconduct or bias: "(1) 'the nature of the issues at trial,' including how lengthy and complex the trial is; (2) 'the conduct of counsel,' and whether the attorneys are 'unprepared or obstreperous,'; and (3) 'the conduct of witnesses.'" *United States v. Smith*, 706 F. App'x 241, 254 (6th Cir. 2017) (quoting *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979). Moreover, the Sixth Circuit "has considered the tone of the judicial interruptions, the extent to which they were directed at one side more than the other, and the presence of any curative instructions at the close of the proceedings." *United States v. Castro*, 405 F.3d 405, 410 (6th Cir. 2005). "[T]he rule concerning judicial interrogation is designed to prevent judges from conveying prejudicial messages to the jury. It is not concerned with the damaging truth that the questions might uncover." *United States v. Martin,* 189 F.3d 547, 554 (7th Cir. 1999).[5]

Upon consideration of the foregoing, and given the facts here, the Court cannot say that the court of appeals' conclusions regarding Petitioner's judicial bias claim are contrary to, or an unreasonable application of, clearly established federal law. Granted, the court of appeals

---

[5] The Court recognizes that decisions from the circuit courts do not constitute clearly established federal law for purposes of AEDPA. *See Parker v. Matthews*, 567 U.S. 37, 48 (2012). However, these decisions provide insight into the factors that appellate courts take into consideration when analyzing a defendant's claim regarding judicial bias.

concluded that several of the judge's questions "appear[ed] to exhibit the judge's disbelief of [Petitioner], which is inappropriate." *Davis*, 2022 WL 1195287, at \*6. The court of appeals pointed out that, in response to one of Petitioner's answers that he thought the room was Armstead's room, the judge said, "Well, that doesn't make any sense to me." *Id.* However, the Supreme Court has never held that the manner in which a judge questions a defendant is so indicative of actual bias that it rises to the level of judicial bias that qualifies as structural error. *See Elizondo v. Bauman*, 674 F. App'x 561, 562 (6th Cir. 2007) (noting that "no United States Supreme Court holding supports Petitioner's claim of judicial bias flowing from a judge's interrogation of a criminal defendant at trial"); *see also Bassett v. Horton*, No. 17-1786, 2017 WL 6820126, at \*2 (6th Cir. Nov. 30, 2017) (rejecting habeas petitioner's judicial bias claim because the judge's questioning of prosecution witnesses, even if extensive, did not "reflect the degree of bias or partiality required to trigger any due process concerns").

Moreover, during preliminary jury instructions, the trial judge informed the jury that "[n]othing I say is meant to reflect my own opinions about the facts of the case." (Trial Tr. II, ECF No. 18-10, PageID.714.) The judge also stated: "I may ask some of the witnesses questions myself. These questions are not meant to reflect my opinion about the evidence. If I ask questions my only reason would be to ask about things that may not have been fully explored." (*Id.*, PageID.716.) The judge reiterated these points during final jury instructions, indicating that his "comments, rulings, questions[,] and instructions are also not evidence." (Trial Tr. V, ECF No. 18-13, PageID.1115.) The judge stated further: "[W]hen I make a comment or give an instruction, I'm not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion." (*Id.*, PageID.1116.) The court of appeals' determination that jurors are presumed to

follow their instructions is entirely consistent with clearly established federal law. *See Weeks v.
Angelone*, 528 U.S. 225, 234 (2000) (noting that "[a] jury is presumed to follow its instructions");
*cf. United States v. Barnhart*, 599 F.3d 737, 746 (7th Cir. 2010) (noting that such an instruction
"limits the degree of influence the questions might otherwise have on the jury's deliberations and
may permit a conclusion that the judge's error was not prejudicial").

In sum, while the court of appeals concluded that some of the trial judge's questioning of
Petitioner may have been improper, Petitioner has not—and cannot—demonstrate that the judge's
questioning rose to the level of judicial bias that constitutes structural error. Petitioner, therefore,
has not demonstrated that the court of appeals' conclusions are contrary to or an unreasonable
application of clearly established federal law. Accordingly, for the foregoing reasons, Petitioner is
not entitled to relief with respect to the due process aspect of habeas ground I.

### B.     Ground II—Insufficiency of the Evidence

As his second ground for relief, Petitioner contends that the prosecution presented
insufficient evidence to support the jury's verdicts, therefore violating Petitioner's due process
rights. (Am. Pet., ECF No. 14, PageID.129.) The court of appeals rejected Petitioner's argument,
first applying the following standard for reviewing Petitioner's claim:

> A challenge to the sufficiency of the evidence is reviewed de novo on appeal.
> *People v. Cline*, 276 Mich. App. 634, 642; 741 N.W.2d 563 (2007). "Evidence is
> sufficient if, when viewed in the light most favorable to the prosecution, a rational
> trier of fact could have found that the essential elements of the crime were proven
> beyond a reasonable doubt." *People v. Blevins*, 314 Mich. App. 339, 357; 886
> N.W.2d 456 (2016) (internal quotation marks and citation omitted). All conflicts in
> the evidence are resolved "in favor of the prosecution." *Id.*

*Davis*, 2017 WL 4078054, at *3. Although the court of appeals cited state authority, the standard
applied is identical to the constitutional "sufficiency of the evidence" standard set forth in *Jackson
v. Virginia*, 443 U.S. 307 (1979), which requires the court to determine "whether, after viewing

24

the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319.

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams v. Taylor*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Jackson* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if the determination of regarding Petitioner's sufficiency of the evidence challenge is an

unreasonable application of *Jackson* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Here, the court of appeals followed *Jackson*'s command and considered the evidence in a light that favored the prosecution:

> To establish second-degree murder, the prosecutor must prove "(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v. Smith*, 478 Mich. 64, 70; 731 N.W.2d 411 (2007). Malice, for purposes of murder, is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful [sic] disregard of the likelihood

26

that the natural tendency of such behavior is to cause death or great bodily harm." *People v. Goecke*, 457 Mich. 442, 464; 579 N.W.2d 868 (1998).

First-degree home invasion can be committed in a number of ways. The elements of the crime are: (1) the defendant (a) broke and entered a dwelling, or (b) entered a dwelling without permission, (2) the defendant (a) intended, when entering the dwelling, to commit a felony, larceny, or assault therein, or (b) committed a felony, larceny, or assault at any time while entering, present in, or exiting the dwelling, and (3) when the defendant entered, was present in, or was leaving the dwelling, (a) he was armed with a dangerous weapon, or (b) another person was lawfully present in the dwelling. MCL 750.110a(2); *People v. Wilder*, 485 Mich. 35, 43; 780 N.W.2d 265 (2010).

As for the crime of torture, it has the following elements: (1) the defendant had custody or physical control over the victim, (2) the defendant exercised custody or physical control over the victim without her consent or without lawful authority, (3) while the defendant had custody or physical control over the victim, he intentionally caused great bodily injury and/or severe mental pain or suffering to the victim, and (4) the defendant intended to cause the victim to suffer cruel or extreme physical pain or mental pain and suffering. MCL 750.85(1); M Crim JI 17.36.

[Petitioner's] liability was predicated upon his status as an aider or abettor. A person aids or abets in the commission of a crime if that person "is present at the crime scene and by word or deed gives active encouragement to the perpetrator of the crime, or by his conduct makes clear that he is ready to assist the perpetrator if such assistance is needed." *People v. Moore*, 470 Mich. 56, 63; 679 N.W.2d 41 (2004) (internal citation and quotation notation omitted). The elements necessary for a conviction as an aider and abettor are (1) the charged offense was committed by the defendant or another person, (2) the defendant performed acts or gave encouragement that assisted in the commission of the charged offense, and (3) the defendant intended the commission of the charged offense, the defendant knew that the other person intended to commit the charged offense, or the charged offense was a natural and probable consequence of the commission of the intended offense. *People v. Robinson*, 475 Mich. 1, 6, 15; 715 N.W.2d 44 (2006); *see also* M Crim JI 8.1.

The evidence clearly established that Armstead committed each of the charged offenses. Armstead broke into the victim's motel room, brutally assaulted her while she was trapped, and stole several of her belongings on his way out. [Petitioner's] culpability in these crimes is equally clear under the record. [Petitioner] helped Armstead break into the room and, if he was not the one speaking to Blevins himself, he was present when a codefendant threatened to kill Blevins. [Petitioner] remained in the room while Armstead assaulted the victim, and [Petitioner] crowded the doorway to block the victim's main avenue of escape. [Petitioner] wiped trace evidence off the door with the victim's wig, and he carried bags of the victim's belongings from the room. Viewed in a light most favorable to the

prosecution, the evidence showed that [Petitioner] was not merely present, but was acting in concert with Armstead and shared Armstead's intent to commit the offenses. The evidence was therefore sufficient to support each of [Petitioner's] convictions under an aiding or abetting theory.

*Davis*, 2017 WL 4078054, at *3–4.

Petitioner now argues that there was no question that he assisted Armstead in entering the hotel room, but that he understood the room to be Armstead's room. (Br. Supp. Am. Pet., ECF No. 15, PageID.162.) Petitioner also avers that he did not assault the victim and "certainly did not aid and abet Chiram Armstead in the assault that led to [her] death." (*Id.*) Overall, Petitioner suggests there was no credible and reliable evidence to support a conclusion that "he beat [the victim] to death, tortured her, invaded her hotel room[,] or aided and abetted others in doing so." (*Id.*) He argues that the court of appeals' conclusion is an objectively unreasonable application of *Jackson* (*Id.*)

Petitioner's argument boils down to the claim that one cannot infer that he aided and abetted Armstead by his limited participation in the events that night. The state court of appeals concluded otherwise. To prevail, Petitioner must show that the inferences urged by the appellate court are unreasonable.

*Jackson* holds that it is the fact-finder's province to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. In *Coleman v. Johnson*, 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining what distinguishes a reasoned inference from 'mere speculation.'" *Id*. at 655. The *Coleman* Court described a reasonable inference as an inference that a rational factfinder could make from the facts. The inferences identified by the court of appeals rationally flow from the underlying facts. The inferences are not compelled by those facts. The inferences may not even be more likely than not; they are simply rational. *Id*. at 656. Nothing more is required.

28

Petitioner has not demonstrated that the court of appeals' inference that he acted in concert with Armstead and shared Armstead's intent to commit the offenses is irrational. Certainly, as Petitioner argues, it is possible that one could interpret Petitioner's actions differently and reach the opposite conclusions; but that does not render the court of appeals' inferences irrational. Thus Petitioner has failed to meet his burden.

It is also worth noting that Petitioner's argument specifically challenges the credibility of the prosecution's witnesses and appears to suggest that none of them provided credible testimony. Petitioner, therefore, appears to invite this Court to reweigh the credibility of these witnesses and resolve all conflicts and make all inferences in his favor. However, it is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences— so long as the inferences are rational. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head.

In sum, Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the verdicts is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief on habeas ground II.

## C.      Ground III—Imposition of Consecutive Sentences

As his third ground for relief, Petitioner contends that the application of consecutive sentences "constitute[s] abusive sentences and a violation of the guarantee against cruel and unusual punishment provided by the United States Constitution." (Am. Pet., ECF No. 14, PageID.129.) According to Petitioner, the imposition of a minimum combined sentence of 47 years essentially amounts to be "very close" to life without parole because Petitioner will not be eligible for parole consideration until he is 74 years old. (Br. Supp. Am. Pet., ECF No. 15, PageID.164.)

29

Petitioner, through appellate counsel, raised this claim on direct appeal, and the court of

appeals rejected it, stating:

>   With regard to the trial court's exercise of discretion in imposing consecutive sentences, [Petitioner] argues that the trial court must have been biased against him because it referred to him as a "savage" just before imposing sentence. Nonetheless, comments critical of or hostile to a party ordinarily do not support a finding of bias, *People v. Wells*, 238 Mich. App. 383, 391; 605 N.W.2d 374 (1999), and this is particularly true at sentencing, when language "need not be tepid," *People v. Antoine*, 194 Mich. App. 189, 191; 486 N.W.2d 92 (1992).
>
>   MCL 750.110a(8) authorizes the trial court, in its discretion, to "order a term of imprisonment imposed for home invasion in the first degree to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." Considering that the victim was brutally assaulted during the course of a home invasion, and that the assault caused the victim's death, we do not find that the trial court's imposition of consecutive sentences for the home invasion and murder convictions was outside the range of reasoned and principled outcomes.
>
>   Regarding [Petitioner's] second argument, a sentence constitutes cruel and unusual punishment when it is grossly disproportionate to the seriousness of the circumstances surrounding the offense and the offender. *People v. Milbourn*, 435 Mich. 630, 636; 461 N.W.2d 1 (1990); *People v. Bullock*, 440 Mich. 15, 32; 485 N.W.2d 866 (1992). "[A] sentence that falls within the guidelines range is presumptively proportionate, and a sentence that is proportionate is not cruel or unusual punishment." *People v. Powell*, 278 Mich. App. 318, 323; 750 N.W.2d 607 (2008) (internal citations omitted). In determining whether a punishment is so disproportionate as to be constitutionally cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, compares the penalty to that imposed for other crimes in this state and to the penalty imposed for the same offense in other states, and considers the goal of rehabilitation. *People v. Launsburry*, 217 Mich. App. 358, 363; 551 N.W.2d 460 (1996).
>
>   [Petitioner] has not undertaken this type of analysis. He argues only that, given the length of time he will have to serve due to the imposition of consecutive sentences, his sentences are not much different than life without parole. The fact that [Petitioner] may serve the remainder of his life in prison, however, does not render his sentences cruel or unusual. *People v. Bowling*, 299 Mich. App. 552, 558–559; 830 N.W.2d 800 (2013). Moreover, because the trial court sentenced [Petitioner] within the sentencing-guidelines range, [Petitioner's] sentences are presumptively proportionate. The fact that [Petitioner's] sentences are to be served consecutively does not overcome the presumption of proportionality, *People v. St. John*, 230 Mich. App. 644, 649; 585 N.W.2d 849 (1998), and [Petitioner] has not provided this Court with any other evidence sufficient to meet his burden to show plain error.

*Davis*, 2017 WL 4078054, at *4–5.

Petitioner contends that the imposition of consecutive sentences is "so grossly disproportionate as to be unconstitutional." (Br. Supp. Am. Pet., ECF No. 15, PageID.166.) The term disproportionate is derived from state court authority regarding sentencing. *See People v. Steanhouse*, 902 N.W.2d 327 (Mich. 2017); *People v. Milbourn*, 461 N.W.2d 1 (Mich. 1990). As noted above, "a federal court may issue the writ to a state prisoner 'only on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). Thus, any claim by Petitioner that the trial court violated state sentencing guidelines or state sentencing principles regarding disproportionality is purely a state law claim that is not cognizable on habeas review.

In *Milbourn*, the Michigan Supreme Court held that a sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9–11; *People v. Babcock*, 666 N.W.2d 231, 236 (Mich. 2003). Nearly three decades later, in *Steanhouse*, the Michigan Supreme Court held that a sentencing court's departure from the sentencing guidelines is unreasonable if the court abused its discretion. *Steanhouse*, 902 N.W.2d at 335. The proper test for determining whether the sentencing court abused its discretion, it held, is found in *Milbourn*'s proportionality analysis. *Id*. at 335–37. In other words, a sentence departing from the guidelines is unreasonable if it is disproportionate.

It is clear that *Milbourn* and, thus, *Steanhouse*, were decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at *2 (6th Cir. Apr. 21, 1995) ("[Petitioner] argues that the trial court improperly exceeded the state sentencing guidelines

and violated the principles of proportionality set forth in [*Milbourn*,] essentially asking the court

to rule on a matter of state law which rarely serves as a basis for habeas corpus relief."); *Clarmont*

*v. Chapman*, No. 20-1205, 2020 WL 5126476, at *1 (6th Cir. Jul. 13, 2020) ("[A]ny state law

challenge to the reasonableness of [petitioner's] sentence or argument that his sentence is

disproportionate under state law is also not cognizable on habeas review."); *Atkins v. Overton*, 843

F. Supp. 258, 260 (E.D. Mich. 1994) ("Petitioner's claim that his sentence violates the

proportionality principle of *People v. Milbourn* does not state a claim cognizable in federal habeas

corpus."). Because this Court has no power to intervene based on a perceived error of state law,

*see Wilson*, 562 U.S. at 5, any claims raised by Petitioner based upon *Milbourn* and *Steanhouse*

are not cognizable in a habeas corpus action.

Petitioner also suggests that the court of appeals' rejection of his claim is contrary to

Supreme Court precedent set forth in *Harmelin v. Michigan*, 501 U.S. 957 (1991). (Br. Supp. Am.

Pet., ECF No. 15, PageID.165.) However, in *Harmelin*, the Supreme Court recognized that the

United States Constitution—particularly the Eighth Amendment---does not require strict

proportionality between a crime and its punishment. *See Harmelin*, 501 U.S. at 965; *see also*

*United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme

disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583;

*see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (discussing that gross disproportionality

principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S. 11, 36 (2003)

(holding that principle applies only in "the rare case in which a threshold comparison of the crime

committed and the sentence imposed leads to an inference of gross disproportionality" (quoting

*Rummel v. Estelle*, 445 U.S. 263, 285 (1980))). A sentence that falls within the maximum penalty

authorized by statute "generally does not constitute 'cruel and unusual punishment.'" *Austin v.*

*Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)). Ordinarily, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole." *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Petitioner was not sentenced to death or life in prison without the possibility of parole, and his sentence falls within the maximum penalty under state law.

For the foregoing reasons, Petitioner is not entitled to relief for habeas ground III.

**D.    Grounds I and IV—Ineffective Assistance of Trial and Appellate Counsel**

As noted above, as part of his first ground for relief, Petitioner contends that trial counsel was ineffective for failing to object to the court's questioning of Petitioner and that appellate counsel was ineffective for failing to raise this claim on direct appeal. (Am. Pet., ECF No. 14, PageID.128.) As his fourth ground for relief, Petitioner argues that trial counsel was ineffective for: (1) failing to secure funds and consult an expert witness in forensic pathology; (2) failing to object to Officer Dabliz's identification testimony; and (3) failing to request a lesser-included jury instruction regarding accessory after the fact. (*Id.*, PageID.129.)

**1.    Standard of Review**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the [Petitioner] resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The [Petitioner] bears the burden of overcoming the presumption that the challenged action might

be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the [Petitioner] is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v.*

*Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Furthermore, scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his ineffective assistance claims in his Rule 6.500 motion. The Michigan Court of Appeals affirmed the trial court's denial of Petitioner's motion in a thorough opinion. *See generally People v. Davis*, No. 353689, 2022 WL 1195287 (Mich. Ct. App. Apr. 21, 2022). In that opinion, the court of appeals set forth the following standard to address Petitioner's claims of ineffective assistance:

> "To demonstrate ineffective assistance of trial counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich. App. 195, 207; 836 N.W.2d 224 (2013). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id.* "A defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *People v Payne*, 285 Mich. App. 181, 190; 774 N.W.2d 714 (2009).

*Davis*, 2022 WL 1195287, at *2. Although the court of appeals cited state law, *Payne* identifies *Strickland* as the source of the standard. *See Payne*, 774 N.W.2d at 721. Thus, there is no question that the court of appeals applied the correct standard. This eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. Therefore, because the court of appeals applied the correct standard, Petitioner can only overcome the deference afforded state

court decisions if the determinations regarding ineffective assistance of counsel are unreasonable applications of *Strickland* or if the court of appeals' resolutions were based on unreasonable determinations of the facts. *See* 28 U.S.C. § 2254(d).

### 2.   Ground I—Ineffective Assistance of Trial and Appellate Counsel

As part of habeas ground I, Petitioner contends that trial counsel was ineffective for failing to object to the trial judge's questioning and that appellate counsel was ineffective for failing to raise the issue on direct appeal. (Am. Pet., ECF No. 14, PageID.128.) The Court considers those assertions below.

### a.   Trial Counsel

According to Petitioner, trial counsel should have objected to the trial judge's questioning of Petitioner. He contends that counsel "should have immediately objected to this testimony, or requested that the jury be excused so that a curative instruction could immediately be given. He did nothing." (Br. Supp. Am. Pet., ECF No. 15, PageID.155.)

In its opinion affirming the denial of Petitioner's Rule 6.500 motion, the court of appeals agreed with Petitioner that trial counsel "performed deficiently by failing to object" to the trial judge's questioning. *See Davis*, 2022 WL 1195287, at *7. Specifically, the court of appeals noted that it was "objectively unreasonable for trial counsel not to have objected to intervene to stop the court's questioning of [Petitioner] once the questioning became excessive and the court began challenging some of [Petitioner's] explanations and responses, or to at least make a record." *Id.* The court of appeals, however, went on to conclude that Petitioner was not prejudiced by counsel's failure to object, stating:

> However, as explained previously, the record does not support the contention that a reasonable probability existed that, but for counsel's failure to object, the outcome of [Petitioner's] trial would have been different. In addition to the fact that the trial court instructed the jury that it[s] comments, rulings, and questions are not evidence and that the jury was to disregard any perceived opinion by the court about the case,

there was very strong evidence to support [Petitioner's] culpability in the crimes such that any inappropriate questions by the court would not have made a difference in the outcome of the trial. *Nix*, 301 Mich. App. at 207. Therefore, [Petitioner] has not established a claim of ineffective assistance of counsel on this basis.

*Davis*, 2022 WL 1195287, at *7.

Petitioner suggests that this opinion "is unreasonable" in light of the due process arguments he set forth to support his judicial bias claim. (Br. Supp. Am. Pet., ECF No. 15, PageID.157.) However, in the context of resolving Petitioner's due process judicial bias claim, the Court has already concluded that the court of appeals reasonably determined that Petitioner was not prejudiced by the trial court's questioning because he failed to demonstrate that the outcome of his trial would have been different. For the same reasons the Court reached that conclusion, the Court also concludes that the court of appeals reasonably determined that Petitioner was not prejudiced by counsel's failure to object. Accordingly, because Petitioner has not demonstrated that the court of appeals' ruling is an unreasonable application of *Strickland*, he is not entitled to relief with respect to this aspect of habeas ground I.

### b. Appellate Counsel

Petitioner also faults appellate counsel for failing to raise on direct appeal the judicial bias claim asserted as habeas ground I. (Br. Supp. Am. Pet., ECF No. 15, PageID.158–159.) Because Petitioner was not prejudiced by trial counsel's failure to object to the questioning, "appellate counsel's failure to raise [any of those claims] on direct appeal cannot be deemed constitutionally deficient performance." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003); *see also Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("If trial counsel performed adequately, our inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."). Thus, Petitioner has not demonstrated that the court of appeals' rejection of his

ineffective assistance of appellate counsel claim is an unreasonable application of *Strickland*. Petitioner, therefore, is not entitled to relief with respect to this aspect of habeas ground I.

### 3.      Ground IV—Ineffective Assistance of Trial Counsel

As his fourth ground for relief, Petitioner argues that trial counsel was ineffective for: (1) failing to secure funds and consult an expert witness in forensic pathology; (2) failing to object to Officer Dabliz's identification testimony; and (3) failing to request a lesser-included jury instruction regarding accessory after the fact. (*Id.*, PageID.129.) The Court considers each of these arguments in turn below.

### a.      Failing to Secure Expert Witness

Petitioner first faults trial counsel for failing to consult and call an expert witness in forensic pathology. According to Petitioner, a defense expert could have testified that the victim's "cause of death was from something other than injuries she suffered at the hotel or that other factors caused by the police or EMS caused her death." (Br. Supp. Am. Pet., ECF No. 15, PageID.170.) According to Petitioner, as part of appellate counsel's investigation "into [Petitioner's] appeal, he contacted two experts in forensic pathology, Dr. Williams Ralston and Dr. Andrew Baker[,] who would be willing to consult and testify on a court appointed case." (*Id.*, PageID.169.)

The court of appeals rejected Petitioner's claim, stating:

> In this case, trial counsel reasonably could have chosen not to call a forensic pathology expert for various reasons, including that the expert's testimony would have been unsupportive or even harmful to the defense. Initially, although [Petitioner] suggests that a forensic pathology expert might have provided exculpatory testimony, he has not demonstrated factual support for this claim, such as by providing an expert witness affidavit indicating what information a forensic pathology expert would have provided, or identifying other evidence of record suggesting that such an analysis could have been helpful. [Petitioner] attempts to establish the factual predicate for this claim with an affidavit from his appellate counsel. In his affidavit, counsel avers that he "contacted two experts in forensic pathology [who] were willing to consult and provide their assistance on a court appointed case," and [Petitioner] submitted the curriculum vitae and fee schedules for the two forensic pathologists who were contacted. However, the affidavit does

not indicate that any contacted expert offered an opinion of any kind related to this case, let alone an opinion favorable to defendant. [Petitioner] has not shown that he was denied the effective assistance of counsel on the basis of the information in appellate counsel's affidavit. In other words, what [Petitioner] and his appellate counsel have provided is not evidence in support of the suggested theory that Blevins could have died from injuries other than those inflicted during the criminal episode. *See People v Lewis*, 305 Mich. 75, 78; 8 N.W.2d 917 (1943) (an attorney's affidavit is insufficient to establish "whether the witnesses referred to can or will testify to the claimed evidence"). Accordingly, there is no competent evidence that either expert witness would have testified favorably for [Petitioner] if called. [Petitioner's] mere speculation that an expert might have provided favorable testimony is insufficient to show that trial counsel's failure to retain an expert was objectively unreasonable, or to show that there is a reasonable probability that the outcome of trial would have been different if an expert had been called. *Payne*, 285 Mich. App. at 190; *Nix*, 301 Mich. App. at 207. Consequently, [Petitioner] has not demonstrated that trial counsel was ineffective for failing to contact or retain a defense expert.

*Davis*, 2022 WL 1195287, at *3.

The court of appeals' determination appears reasonable on its face and echoes clearly established federal law. The Supreme Court has recognized that "[t]he selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after a thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting *Strickland*, 466 U.S. at 690). Here, Petitioner attempts to shoehorn his challenge into the confines of a "challengeable" expert witness decision by claiming that counsel failed to consult and retain an expert witness. However, there is no record support for Petitioner's contention that trial counsel did **not** investigate the possibility of obtaining expert testimony. Absent such support, Petitioner cannot overcome the presumption that counsel's actions fell within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Even without this presumption, Petitioner's claim of ineffective assistance fails. Although Petitioner suggests that appellate counsel consulted two experts who would have been willing to testify on Petitioner's behalf, the court of appeals noted that the experts consulted by appellate counsel did not make any representations that their testimony would have been favorable to

Petitioner. Notably, the affidavit prepared by appellate counsel is not a part of the record evidence before this Court. Without some record support that an expert would have provided favorable testimony, it is impossible for Petitioner to demonstrate that counsel was professionally unreasonable for failing to consult and call an expert or that it made any difference in the result of Petitioner's trial.

"A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (6th Cir. 1991) (footnote omitted); *see also Lagrone v. Parris*, No. 23-5177, 2023 WL 5623279, at *4 (6th Cir. Aug. 7, 2023) ("Lagrone did not identify an expert his trial counsel could have called or indicate what an expert could have testified that would have been relevant to his defense. The speculative impact of expert testimony is not enough to prove prejudice under *Strickland*."); *Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) (stating that "[t]he salient point is that nobody knows what she would have said. Speculation cannot suffice to establish the requisite prejudice.").

Moreover, as noted by the Sixth Circuit, "the Supreme Court has held that '[i]n many instances *cross-examination will be sufficient* to expose defects in an expert's presentation.'" *Jackson v. McQuiggin*, 553 F. App'x 575, 582 (6th Cir. 2014) (quoting *Harrington*, 562 U.S. at 111). The prosecution presented Dr. Bernardino Bacris, a deputy medical examiner from the Oakland County Medical Examiner's Office, as an expert witness in forensic pathology. (Trial Tr. II, ECF No. 18-109, PageID.794–795.) Dr. Bacris testified that he believed the victim succumbed to her injuries in a matter of "two to five minutes." (*Id.*, PageID.814.) He also noted that one of the injuries alone could have killed her. (*Id.*, PageID.815.) Petitioner's counsel briefly cross-examined Dr. Bacris. (*Id.*, PageID.821–822, 824–826.) It appears that counsel's strategy was to

suggest that the victim was still alive when police and EMTs arrived and that the injuries could not be conclusively determined as her cause of death. The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel's pursuit of it was professionally unreasonable. Petitioner, therefore, is not entitled to habeas relief with respect to this assertion of ineffective assistance.

### b.      Failing to Object to Identification Testimony

Next, Petitioner faults trial counsel for failing to object to identification testimony provided by Officer Dabliz. (Am. Pet., ECF No. 14, PageID.129.)

At trial, Officer Dabliz testified that he was very familiar with the Victory Inn from "several investigations and several runs." (Trial Tr. IV, ECF No. 18-12, PageID.928.) He noted that on or about July 4, 2015, he was asked by officers from the homicide department to view a video from the Victory Inn. (*Id.*) Officer Dabliz testified that he was able to identify three individuals from that video. (*Id.*) His identifications were based on his prior experience in the Special Operations unit. (*Id.*, PageID.928–929.)

Officer Dabliz further testified that he reviewed videos and photographs from social media. (*Id.*, PageID.929.) He identified four individuals from those items. (*Id.*, PageID.930.) Officer Dabliz testified that one of the individuals was Petitioner, and that two of the three others were Armstead and Kelly. (*Id.*) Officer Dabliz noted that he had "[a] handful, five or ten times" prior contact with Petitioner. (*Id.*, PageID.930–931.) Officer Dabliz also testified that he viewed the video from the Victory Inn about three or four times, and that he was able to "relatively quick[ly] identify the individuals shown in the video from "previous experience and investigation." (*Id.*, PageID.938.) He identified Kelly, Armstead, and Petitioner as the individuals from the video. (*Id.*, PageID.939–940.)

41

The court of appeals addressed this claim in Petitioner's appeal from the denial of his Rule 6.500 motion. The court of appeals noted that, pursuant to state law applying Michigan Rule of Evidence 701, "if a witness is in no better position than the jury to identify a person in a video or still photograph, the witness's opinion testimony identifying a defendant as the individual depicted is generally inadmissible as an invasion of the province of the jury." *Davis*, 2022 WL 1195287, at *3. However, "if a witness is in a better position than the jury to identify a person depicted in a video or photograph, the lay opinion testimony does not invade the province of the jury." *Id*. The court of appeals noted that the use of such testimony has been upheld in situations where the witness "has had substantial and sustained contact with the person in the photograph." *Id*. (quoting *United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993)).

After setting out the foregoing, the court of appeals noted that "there was evidence that the officer was familiar with [Petitioner], having encountered him 5 or 10 times." *Davis*, 2022 WL 1195287, at *4. This Court is bound by the court of appeals' conclusion. *See, e.g., Bradshaw*, 546 U.S. at 76 (stating "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Thus, Petitioner's proposed objection would have been meritless. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley*, 706 F.3d at 752.

Moreover, the court of appeals recognized that Petitioner's defense was not that the person on the video was someone else—not him—but that he was "merely present." *Id*. The court of appeals concluded that, in light of the defense theory of "mere presence," it was professionally reasonable to forego an objection to the officer's testimony. *Id*.

Finally, even if the officer had not testified, the jury would have still viewed the video and may well have determined that one of the individuals depicted on the video was Petitioner. Thus,

the defense theory of "mere presence," which obviated any possible benefit from the objection, was a reasonable strategy.

The Michigan Court of Appeals' determination that counsel's conduct was professionally reasonable is consistent with *Strickland* and well-supported by the record. Consequently, Petitioner cannot establish a claim of ineffective assistance of counsel on this basis.

### c.    Failing to Request Jury Instruction

Petitioner next faults counsel for failing to request a jury instruction regarding accessory after the fact. (Br. Supp. Am. Pet., ECF No. 15, PageID.172.) Petitioner acknowledges that accessory after the fact, unlike aiding and abetting, is a separate substantive offense and not a theory of the case. (*Id.*) Petitioner, however, avers that counsel should have requested an accessory after the fact instruction because "there was ample evidence at trial that [Petitioner] rendered assistance to Mr. Armstead by wiping down the door to room 133 and leaving with Mr. Armstead." (*Id.*)

The court of appeals rejected Petitioner's argument, stating:

> An accessory after the fact is "one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment" and is comparable to obstruction of justice. *People v Perry*, 460 Mich. 55, 62; 594 N.W.2d 477 (1999) (quotation marks and citation omitted). While [Petitioner] asserts that accessory after the fact should be considered a lesser offense of aiding or abetting, he acknowledges that the Supreme Court in *Perry* stated that aiding or abetting is not a separate substantive offense, but a theory of the prosecution, and that the same class or category analysis for lesser offenses must be between substantive offenses. *Id.* at 63 n 20, 64-65. Although [Petitioner] argues that *Perry* should not control this case, this Court is bound to follow decisions of our Supreme Court that have not been overruled or superseded. *People v Anthony*, 327 Mich. App. 24, 44; 932 N.W.2d 202 (2019). Consequently, while [Petitioner] seeks to preserve his claim that accessory after the fact is a lesser offense of aiding or abetting, he is not entitled to appellate relief on this basis.

> Furthermore, although not addressed by [Petitioner], we note that accessory after the fact is not a lesser offense of any of the substantive offenses in this case, which are murder, home invasion, and torture. In *Perry*, our Supreme Court held that accessory after the fact is not a lesser offense of murder. *Perry*, 460 Mich. at 62.

> Likewise, accessory after the fact is not a lesser offense of either home invasion or torture. . . . Simply comparing the elements of the offenses shows that it is certainly possible to commit both torture and home invasion without committing the crime of accessory after the fact. Thus, because [Petitioner] was not charged with the substantive offense of accessory after the fact, and accessory after the fact is not a lesser offense of any of the charged crimes, trial counsel's failure to request the instruction was objectively reasonable. *Nix*, 301 Mich. App. at 207. Counsel is not required to make a futile request for an inapplicable jury instruction. *See People v Ericksen*, 288 Mich. App. 192, 201; 793 N.W.2d 120 (2010). Consequently, [Petitioner] cannot establish that trial counsel was ineffective for failing to request an accessory-after-the-fact instruction.

*Davis*, 2022 WL 1195287, at *4–5.

This Court is bound by the court of appeals' conclusion that Petitioner was not entitled to an accessory after the fact instruction under state law. *See, e.g., Bradshaw*, 546 U.S. at 76 (stating "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The instruction request proposed by Petitioner, therefore, would have been meritless. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley*, 706 F.3d at 752. Petitioner, therefore, has not demonstrated that the court of appeals' rejection of this claim of ineffective assistance was an unreasonable application of *Strickland*, and he is not entitled to relief with respect to this claim.

### E. Grounds V and VI—Request for a New Trial, Newly Discovered Evidence, and Actual Innocence

As his fifth ground for relief, Petitioner contends that due process requires that he receive a new trial premised upon newly discovered evidence. (Am. Pet., ECF No. 14, PageID.129.) Specifically, Petitioner avers that his co-defendant, Chiram Armstead, has prepared an affidavit acknowledging that Petitioner had no role in the victim's death. (*Id.*) As his sixth ground for relief, Petitioner contends that his convictions must be vacated under the actual innocence standard. (*Id.*) Essentially, Petitioner maintains that he is actually innocent based upon Armstead's affidavit.

Petitioner's claim of actual innocence fails to state a cognizable federal claim. In *Herrera*, the Supreme Court stated: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." 506 U.S. at 400. But the *Herrera* Court did not close the door completely, stating in dicta: "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House*, 547 U.S. at 555 ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup*, 513 U.S. at 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally

barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free-standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claim is without merit. The Sixth Circuit repeatedly has held that free-standing claims of actual innocence are not cognizable on habeas corpus review. *See Smith v. Nagy*, 962 F.3d 192, 206 (6th Cir. 2020) (citing *Schlup* and *Herrera*); *Cress*, 484 F.3d at 854 (citing cases). Even if Petitioner could invoke this exception and obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case."). Accordingly, Petitioner cannot obtain habeas corpus relief on his freestanding claims of actual innocence, and he is not entitled to habeas relief with respect to grounds V and VI.

F.      **Ground VII—Denial of Rule 6.500 Motion**

As his seventh and final ground for relief, Petitioner faults the state courts for denying his

Rule 6.500 motion. (Am. Pet., ECF No. 14, PageID.130.) Petitioner argues that he was entitled to

relief pursuant to Rule 6.500 because he "has satisfied the requirements of good cause and actual

prejudice" set forth in Michigan Court Rule 6.508(D). (Br. Supp. Am. Pet., ECF No. 15,

PageID.178.)

To the extent that Petitioner asserts that the state courts erred in applying the pertinent state

rules governing motions for relief from judgment, he fails to state a claim for habeas relief. State

courts are the final arbiters of state law, and the federal courts will not intervene in such matters.

*See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The decision of the state courts on a state law issue

is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw*

*v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of

state law, including one announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus."). Accordingly, the state courts' determination that Petitioner was

not entitled to post-conviction relief under state law is, therefore, axiomatically correct on habeas

review.

Moreover, the Sixth Circuit has explained why a state court's failure to follow its own rules

regarding post-conviction proceedings raises only state law issues:

> [T]he Sixth Circuit has consistently held that errors in post-conviction proceedings
> are outside the scope of federal habeas corpus review. *See Kirby v. Dutton*, 794
> F.2d 245, 246–47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002).
> We have clearly held that claims challenging state collateral post-conviction
> proceedings "cannot be brought under the federal habeas corpus provision, 28
> U.S.C. § 2254," because "'the essence of habeas corpus is an attack by a person in
> custody upon the legality of that custody, and . . . the traditional function of the writ
> is to secure release from illegal custody.'" *Kirby*, 794 F.2d at 246 (quoting *Preiser*
> *v. Rodriguez*, 411 U.S. 475, 484 (1973)); *see also Pennsylvania v. Finley*, 481 U.S.
> 551, 557 (1987) ("States have no obligation to provide this avenue of relief, and
> when they do, the fundamental fairness mandated by the Due Process Clause does

not require that the State supply a lawyer as well." (citation omitted)). A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Kirby*, 794 F.2d at 247. "Though the ultimate goal in" a case alleging post-conviction error "is release from confinement, the result of habeas review of the specific issue[ ] . . . is not in any way related to the confinement." *Id*. at 248. Accordingly, we have held repeatedly that "the scope of the writ [does not] reach this second tier of complaints about deficiencies in state post-conviction proceedings," noting that "the writ is not the proper means" to challenge "collateral matters" as opposed to "the underlying state conviction giving rise to the prisoner's incarceration." *Id*. at 248, 247; *see also Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002) ("error committed during state post-conviction proceedings can not [sic] provide a basis for federal habeas relief" (citing *Kirby*, 794 F.2d at 247)); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir.2001) ("habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief").

*Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *see also Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 855 (6th Cir. 2007) (declining to revisit *Kirby* because the petitioner "ha[d] not pointed to any decision by an *en banc* court or any Supreme Court decision to undermine the logic of *Kirby*"). Accordingly, Petitioner's attack on the state courts' application of Rule 6.508(D) is not cognizable on habeas review, and he is not entitled to relief on habeas ground VII.

## V.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under

*Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment denying the petition, as well as an order denying Petitioner's request for an evidentiary hearing and a certificate of appealability.


Dated:   January 30, 2024                    /s/ Paul L. Maloney
                                              Paul L. Maloney
                                              United States District Judge

49